UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

**KYLE BODIN**                               **CIVIL DOCKET NO. 6:22-CV-01863**

**VERSUS**                                    **JUDGE DAVID C. JOSEPH**

**MORTON SALT, INC., ET AL**          **MAGISTRATE JUDGE DAVID J. AYO**

## MEMORANDUM RULING

Before the Court are two Motions for Summary Judgment (the "Motions") filed by Defendants, International Chemical Workers Union Council/UFCW, Local 29C, (the "Union" or "ICWUC") and Morton Salt, Inc. ("Morton"). [Docs. 39, 41]. Oppositions were filed by Plaintiff, Kyle Bodin ("Plaintiff" or "Bodin") [Docs. 43, 44], to which ICWUC and Morton have filed Reply briefs [Docs. 45, 46]. After careful consideration and for the reasons set forth below, the Court grants both Motions.

### FACTUAL BACKGROUND

This case arises from an on-the-job safety incident that resulted in Plaintiff's termination from Morton. [Doc. 41-2, p. 3]. Plaintiff worked at the Morton Salt Weeks Island Facility in Iberia Parish, Louisiana, from 1999 until his termination on August 9, 2021. [Doc. 41-2, p. 4]. Plaintiff held several different positions during his employment with Morton, but for the last five years worked as an electrical apprentice. [Doc. 39-5, pp. 14, 22]. Plaintiff was a member of the ICWUC labor union throughout his employment with Morton. [Doc. 41-2, p. 10]. As such, the terms of his employment were governed by a collective bargaining agreement ("CBA") that was negotiated between Morton and the Union. [Doc. 39-1, pp. 4-5].

On July 29, 2021, Plaintiff and electrician Greg Danron were asked to inspect the power cables plugged into the "#11 Starter Box." [Doc. 39-1, p. 7]. Plaintiff and Danron were instructed not to make repairs, but to simply assess what work and materials would be required to repair the machinery at a later time. [Doc. 39-1, p. 7]. Because the job involved the #11 feeder cable – a 480-volt electrical line that supplies power to the #11 Starter Box – the work was supposed to be completed pursuant to Morton's standard operating procedure ("SOP") on "Cable Management/Handling." [Doc. 41-2, p. 5]. That SOP specifically requires employees "to lock out, tag out, and try out" a power source before making any repairs to electrical components.[1]  *Id.*

After receiving their assignment, Plaintiff and Danron entered the salt mine, obtained their tools for the job, and drove their vehicle to the area where the #11 Starter Box was located. [Doc. 39-1, pp. 7-8]. Once they arrived, Danron informed Plaintiff that he had previously locked out the #11 feeder source two weeks prior. [Doc. 39-1, p. 8]. Plaintiff and Danron looked at Danron's lock and determined that it still appeared to be in place. *Id.* Neither Plaintiff nor Danron "tried out" Danron's lock, nor did Plaintiff place his own lock and tag on the Power Center. *Id.* The pair

---

[1] Morton's SOP for "Cable Management/Handling Policy" in place at the time of the incident specifically requires employees to "lock out, tag out, and try out before any repairs" are made and states that this policy "is a Cardinal Rule." [Doc. 41-7, p. 3]. Moreover, Morton's Safety Handbook, which is distributed to each employee, further details the policy and notes that "[e]ach employee working on a piece of equipment will place their own locks on the main switch or valve controlling the power source." [Doc. 41-6, pp. 35-39]. The Handbook also includes under the "Cardinal Rule" section: "ENERGY SOURCES will be properly isolated, locked out, and tagged out as required before work beings." *Id.* at p. 2.

Though Plaintiff did not recall receiving a handbook from Morton, he stated in his deposition that he had seen the handbooks "around the plant." [Doc. 39-5, p. 24]. Additionally, Plaintiff testified that he recalled discussing the "lock out/tag out" policy at the annual "refresher" courses he attended as a part of his employment since he started in 1999. *Id.* at p. 16.

then traveled approximately forty yards to the #11 Starter Box and walked around to examine the cables feeding into it. *Id.* There, they determined that two color-coded cables had been installed backwards and proceeded to reverse the cables. *Id.* When they returned to remove Danron's lock and tag, they discovered that the lock had been "tampered" with and that the breaker switch was in the "ON" position. [Doc. 39-1, pp. 8-9]. Upon closer inspection, Danron noticed that although the power indicator lights were off, the power had been on the entire time they were working on the electrical equipment. [Doc. 39-1, p. 9]; [Doc. 41-2, p. 9].

Because power running without a visible safety light is a hazardous condition, Plaintiff and Danron reported the condition, or "near miss" incident, to Morton's maintenance manager, Heath Segura ("Segura"). [Doc. 39-1, p. 10]. Segura took pictures of the malfunctioning equipment, obtained written statements from Plaintiff and Danron, and contacted the Human Resources Department.[2] [Doc. 39-1, p. 10]. Morton then began an investigation into the incident and placed Plaintiff and Danron on leave later that day. [Doc. 39-1, p. 10].

On August 2, 2021, Plaintiff and a Union representative attended a meeting with management to discuss the incident. *Id.* Plaintiff also participated in a conference call with management, a Union representative, and an electrical foreman the following day. *Id.* Upon concluding its investigation, Morton terminated Plaintiff and Danron on August 9, 2021, for failing to follow the "lock out, tag out, try out" procedure. [Doc. 41-12].

---

[2] Before informing Segura, Plaintiff and Danron encountered Union Vice President Eddie Jean-Louis and Plaintiff told him to "get the paperwork ready." [Doc. 39-1, p. 9].

Pursuant to the terms of the CBA, the Union filed a grievance challenging Plaintiff's termination on August 28, 2021, which was acknowledged by Morton on August 31, 2021.³ [Doc. 39-1, p. 15]; [Doc. 44-1, p. 6]. Morton denied the grievance on September 3, 2021, stating that Plaintiff admitted he failed to comply with the "lock out/tag out" procedure and did not properly inspect his co-worker's previously installed lock. [Doc. 41-13]; [Doc. 39-3, p. 52]. After receiving Morton's response, the Union Executive Board met and decided not to pursue Plaintiff's grievance further or take the matter to arbitration pursuant to the terms of the CBA. [Doc. 39-3, pp. 2, 21-23]. In making this decision, the Union determined that a challenge to Plaintiff's termination was unlikely to succeed because Bodin and Danron had violated one of Morton's "cardinal rules." *Id.*

## PROCEDURAL HISTORY

On May 16, 2022, Plaintiff filed suit in the 16th Judicial District Court, Iberia Parish, Louisiana, against ICWUC and Morton asserting claims of wrongful termination, negligence, and breach of the CBA. [Doc. 1]. On June 23, 2022, Morton

---

³ The CBA requires that a grievance must be "reduced to writing and presented to the Plant Manager or his representative within [t]en (10) working days after the cause of the grievance occurs." [Doc. 39-3, p. 21]. The plant manager is then given five working days to answer, and the chief steward and shop committee shall then either endorse the grievance or request a meeting with the plant manager within three working days of receiving the response. If a meeting is requested, it must be scheduled within five (5) working days of such request. If no request is made, the matter is considered settled. *Id.* If these efforts fail to resolve the grievance, the Union may choose to bring the matter to arbitration. Here, because then Union President, Classie Charles, was out sick, Charles requested and was granted an extension of time in which to file the grievance. [Doc. 39-3, p. 2].

removed the suit to this Court on the basis of federal question jurisdiction with the consent of ICWUC.[4] [Doc. 1].

Because Plaintiff's claims arise from the CBA between ICWUC and Morton, this Court found in a previous ruling that Plaintiff's state law claims were preempted by the Labor Management Relations Act ("LMRA") and therefore recharacterized this action as a "hybrid" claim brought under the LMRA.[5] [Doc. 22]. Under § 301 of LMRA, a "hybrid action" is one in which a member of a union sues both his employer for breach of its contractual obligations under a collective bargaining agreement and the union for breach of its duty of fair representation. *Carrington v. United States*, 42 F.Supp.3d 156, 161 (D.D.C. 2014). Thus, Plaintiff's remaining claims are: (i) a breach of contractual obligation under the CBA against Morton; and (ii) a breach of fair representation against ICUWC.

ICWUC and Morton filed the instant Motions on June 27, 2023. [Docs. 39, 41]. ICWUC asserts that there is no genuine dispute of material fact that the Union acted

---

[4] Section 301 of the Labor Management Relations Act ("LMRA") states that suits involving "violations of contracts between an employer and a labor organization representing employees in an industry affecting commerce … may be brought in any district court of the United States having jurisdiction over the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." 29 U.S.C. § 185(a).

[5] According to Fifth Circuit precedent, "Section 301 not only gives federal courts jurisdiction to hear employment cases covered by collective bargaining agreements, but also directs them to fashion a body of federal common law to resolve such disputes and preempts any state law claims which require the interpretation of a collective bargaining agreement." *Baker v. Farmers Elec. Co-op., Inc.*, 34 F.3d 274, 279 (5th Cir. 1994) (internal quotation omitted). The purpose behind this preemption "is to ensure that issues raised in actions covered by Section 301 are decided in accordance with the precepts of federal labor policy." *Id*. The Court previously determined that Plaintiff's negligence, wrongful termination, and breach of contract claims were all "substantially intertwined with the CBA and [therefore] preempted by federal law." [Doc. 22, p. 5].

reasonably in declining to pursue Plaintiff's grievance further and, accordingly, that it did not violate its duty of fair representation. [Doc. 39-1, p. 23]. Morton contends that Plaintiff has failed to present sufficient evidence to establish a claim under § 301 of the LMRA because he failed to exhaust all administrative remedies under the CBA and that Plaintiff's termination was otherwise proper.[6] [Doc. 41-2, pp. 15, 18]. In response, Plaintiff asserts there are genuine disputes of material fact concerning: (i) whether ICWUC was "arbitrary in [its] treatment of [Plaintiff's] dispute;" and (ii) whether Morton's termination of Plaintiff was proper. [Doc. 44-2, p. 11]; [Doc. 43-2, p. 13].

---

[6] The Union and Morton also assert that Plaintiff's claims should be dismissed because they were not timely filed. [Doc. 39-1, p. 23]; [Doc. 41-2, p. 14]. Hybrid claims under § 301 are subject to a six-month statute of limitations. *DelCostello v. International Brotherhood of Teamsters*, 462, U.S. 151, 165 (1983). This limitations period is drawn from § 10(b) of the National Labor Relations Act, which sets a six-month period for bringing charges of unfair labor practices to the National Labor Relations Board. 29 U.S.C. § 160(b); *see Smith v. Intern. Org. of Masters, Mates and Pilots*, 296 F.3d 380, 382 (5th Cir. 2002) (citing *DelCostello v. Int'l Brotherhood of Teamsters*, 462 U.S. 151, 155 (1983)). The statute of limitations "begins to run when the plaintiff either knew or should have known of the injury itself rather than of its manifestations." *Barrett v. Ebasco Constructors, Inc.*, 868 F.2d 170, 171 (5th Cir. 1989).

Plaintiff filed suit on May 16, 2022. [Doc. 1]. The Union and Morton argue Plaintiff's claims are time barred because he knew or should have known of the alleged breach, alternatively: (i) on August 9, 2021, when he was terminated; (ii) on September 3, 2021, when Morton denied his grievance; or (iii) on October 14, 2021, when Plaintiff contacted the Union and knew that the Union was not challenging his grievance. [Doc. 39-1, p. 24]; [Doc. 41-2, p. 15]. Plaintiff asserts, however, that because there is no express federal statute that governs § 301 or fair representation claims, the Court should look to analogous state statute of limitations, as other courts have done, with respect to his breach of fair representation claim. [Doc. 44-2, p. 13]. Here, because the Court can decide the Motions on other grounds, the Court needs to address Defendants' timeliness arguments.

## LAW AND ANALYSIS

### I.  Summary Judgment Standard

A court should grant a motion for summary judgment on any claim or defense, or portion thereof, when the pleadings in conjunction with affidavits and documentary evidence, "show that there is no dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  In applying this standard, the court should construe "all facts and inferences in favor of the nonmoving party." *Deshotel v. Wal-Mart Louisiana L.L.C.*, 850 F.3d 742, 745 (5th Cir. 2017); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). As such, the party moving for summary judgment bears the burden of demonstrating that there is no genuine dispute of material fact as to issues critical to trial that would result in the movant's entitlement to judgment in its favor, including identifying the relevant portions of pleadings and discovery.  *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995).  The court must deny the moving party's motion for summary judgment if the movant fails to meet this burden.  *Id.*

If the movant satisfies its burden, however, the nonmoving party must "designate specific facts showing that there is a genuine issue for trial."  *Id.* (citing *Celotex*, 446, U.S. at 325).  There is no genuine issue for trial — and thus a grant of summary judgment is warranted — when the record as a whole "could not lead a rational trier of fact to find for the non-moving party."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II. Labor Management Relations Act

As addressed in this Court's previous ruling, Plaintiff's breach of duty of fair representation against the Union and breach of contract claim against Morton are brought pursuant to § 301 of the LMRA. [Doc. 22]. Section 301 provides employees a federal cause of action against their employer for breach of a collective bargaining agreement. It also provides an implied cause of action against the employee's labor union for breaching its duty of fair representation. *Bache v. Am. Tel. & Tel.*, 840 F.2d 283, 287 (5th Cir. 1988). "Because of the intricate relationship between the duty of fair representation and the enforcement of a collectively bargained contract, the two causes of action have become 'inextricably interdependent' and known as a 'hybrid § 301/fair representation' suit." *Id.* at 287-88 (citing *DelCostello v. Int'l Brotherhood of Teamsters*, 462 U.S. 151, 164-65 (1983)). The Court addresses the claims against each defendant in turn.

### A. Duty of Fair Representation Claims Against ICWUC

In its Motion for Summary Judgment, the Union argues that its decision not to further challenge Plaintiff's discharge was reasonable and therefore not a violation of the duty of fair representation. [Doc. 39-1, p. 17]. In response, Plaintiff contends that the Union was "arbitrary in their treatment of [Plaintiff's] dispute," because: (i) the Union "did not produce the endorsement of the grievance as required;" and (ii) the Union failed to inform Plaintiff they were not going to pursue his grievance any further. [Doc. 44-2, p. 11].

It is well established that "[a] union has a legal duty to process a grievance and must either prosecute the grievance or refuse to for adequate reason to do so, such as

deciding in good faith that the grievance lacks merit." *Davis v. United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied, Indus. & Serv. Workers Int'l Union, Loc. No. 13-423*, 750 F. App'x 335, 339 (5th Cir. 2018) (internal quotations and citations omitted). However, because an employee "has no absolute right to have his grievance taken to arbitration" or to "any other level of the grievance process," a union "retains considerable discretion … in processing the grievances of its members." *Landry v. The Cooper/T.Smith Stevedoring Co.,* 880 F.2d 846, 852 (5th Cir. 1989) (citing *Turner v. Air Transport Dispatchers Assoc.*, 468 F.2d 297, 299 (5th Cir. 1972)).

Therefore, to prevail on a fair representation claim challenging how a union handled the grievance procedure, the employee must show that the union's conduct "was arbitrary, discriminatory, or in bad faith, so that it undermined the fairness or integrity of the grievance process." *Landry v. The Cooper/T. Smith Stevedoring Co.*, 880 F.2d 846, 852 (5th Cir. 1989). "Under this test, a union may not arbitrarily ignore a meritorious grievance or process it in perfunctory fashion." *Id.* (internal quotations omitted). But a mere "[a] showing of negligence or error in judgment on the part of the union in its representative capacity is not enough to sustain an unfair representation claim." *Jaubert v. Ohmstede, Ltd.*, 574 F. A'ppx 498, 502 (5th Cir. 2014) (citing *Landry*, 880 F.2d at 852). Importantly, "[e]ven if a member shows that his union breached its duty, he must also show that the breach 'contributed to the erroneous outcome of the … proceedings.'" *Carr v. Air Line Pilots Ass'n, Int'l*, 866 F.3d 597, 602 (5th Cir. 2017), *as revised* (July 14, 2017).

Here, while Plaintiff does point to certain procedural defects in how the Union handled his grievance, the Court finds that these amount to – at most – technical

mistakes that did not prejudice Plaintiff. At bottom, the undisputed facts demonstrate that: (i) the Union filed a grievance on behalf of Plaintiff, and (ii) made an informed decision concerning whether the grievance should be pursued further or brought to arbitration. Thus, even if Plaintiff is correct in his assertions that the Union failed to endorse his grievance and did not inform him of their decision to not challenge his claim, the Union's actions do not constitute a breach of its duty of fair representation. *See Davis v. United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied, Indus. & Serv. Workers Int'l Union, Loc. No. 13-423*, 750 F. App'x 335, 341 (5th Cir. 2018) (holding union that "failed to communicate" with the plaintiff "at various points" during a grievance investigation "does not rise to the level of arbitrary or bad faith conduct"); *Jaubert*, 574 F. A'ppx at 502 (5th Cir. 2014) (noting "[a] union's investigation need not be perfect to be adequate") (citing *Connally v. Transcon Lines*, 583 F.2d 199, 202-03 (5th Cir. 2008); *Turner v. Air Transport Dispatchers' Ass'n*, 468 F.2d 297, 300 (5th Cir. 1972) (holding that it is within a union's "broad discretion" to "refuse to initiate the first steps in the appeal procedure when it believes the grievance to be without merit").

The Court further finds that the factual record shows the Union's behavior was substantively reasonable and did not undermine either the fairness or the integrity of the grievance process. ICWUC President Classie Charles stated in his declaration that the Union decided not to bring Plaintiff's claim to arbitration because Plaintiff admitted he had violated a "Cardinal Rule" by failing to "lock out/tag out/try out" the equipment, and because Morton had previously fired three or four other employees for violating "Cardinal Rules." [Doc. 39-3, p. 2]. Thus, believing any challenge would

be unsuccessful, the Union's decision to not challenge Plaintiff's grievance was not so "outside a wide range of reasonableness as to be irrational." *Jaubert v. Ohmstede, Ltd.*, 574 F. A'ppx 498, 503 (5th Cir. 2014) (citing *Air Line Pilots Ass'n, Int'l*, 499 U.S. at 67).

All told, the facts before the Court demonstrate that the Union's decision not to pursue Plaintiff's grievance to arbitration was a reasoned one. Plaintiff was aware of Morton's "lock out/tag out" policy and admitted that he did not comply with the policy – both by failing to place his own lock on the breaker *and* by not properly inspecting Danron's previously installed lock. [Doc. 39-3, p. 52]. Because the Union did not act arbitrarily or in bad faith in handling Plaintiff's grievance, it did not breach its duty of fair representation and ICWUC is entitled to summary judgment.

### B. **Breach of Contract Claims Against Morton**

A plaintiff bringing a hybrid breach of contract and fair representation suit "must prove *both* that the employer violated the CBA and that the union breached its duty." *Jaubert v. Ohmstede, Ltd.*, 574 F. App'x 498, 501 (5th Cir. 2014) (citing *DelCostello*, 462 U.S. 151, 164-65 (1983)). "[T]he indispensable predicate for a § 301 action in this situation is a fair representation claim against the union." *Id.* (citing *Daigle v. Gulf State Utils. Co.*, 794 F.2d 974, 977 (5th Cir. 1986). Accordingly, if the union did not breach its duty, the Court need not consider whether the employer breached the CBA. *Jaubert*, 574 F. App'x at 501; *see also United Parcel Serv., Inc. v. Mitchell*, 651 U.S. 56, 67 (1981) (Stewart, J., concurring) (noting the plaintiff "must prevail upon his unfair representation claim before he may even litigate the merits of his § 301 claim against the employer").

Here, because the Union did not breach its duty of fair representation, the Court need go no further to determine that Morton is likewise entitled to summary judgment.

## CONCLUSION

For the foregoing reasons,

IT IS HEREBY ORDERED that Defendant ICWUC's MOTION FOR SUMMARY JUDGMENT [Doc. 39] is GRANTED.

IT IS FURTHER ORDERED that Defendant Morton Salt, Inc.'s MOTION FOR SUMMARY JUDGMENT [Doc. 41] is GRANTED.

IT IS FURTHER ORDERED that all of Plaintiff's claims are DISMISSED WITH PREJUDICE.

THUS, DONE AND SIGNED in Chambers on this 6th day of September 2023.

_____
DAVID C. JOSEPH
UNITED STATES DISTRICT JUDGE